LEONARDO ET AL. *v.* BOARD OF COUNTY COMMISSIONERS OF ST. MARY'S COUNTY ET AL.

(Two Appeals in One Record)

[No. 230, October Term, 1956.]

*Decided July 30, 1957.*

*Motion for rehearing filed August 14, 1957, denied September 24, 1957.*

The cause was argued before Brune, C. J., and Collins, Henderson, Hammond and Prescott, JJ.

*Hyman Ginsberg,* with whom were *George T. Burroughs, Wm. Aleck Loker* and *Ginsberg & Ginsberg* on the brief, for the appellants and cross-appellees.

*H. Warren Buckler, Jr.,* and *William O. E. Sterling* for the appellees and cross-appellants.

PRESCOTT, J., delivered the opinion of the Court.

In this case, there are cross appeals from a decree of the Circuit Court for St. Mary's County. The decree enjoined the appellees and cross-appellants (hereafter called "appellees") from collecting a front foot benefit tax assessed and levied against two lots belonging to Ercole Leonardo, and wife, two of the appellants and cross-appellees (all of the appellants and cross-appellees are hereafter called "appellants"). It also authorized the appellees to collect *ad valorem* taxes assessed and levied against the said two lots, and front foot benefit taxes and *ad valorem* taxes assessed and levied against all the other lots in a separate taxing and assessment district; provided and upon the condition that two additional lots be included in the separate taxing and assessment district and that front foot benefit and *ad valorem* taxes be assessed and levied against these two lots. The appellants attack the constitutionality of the legislation by which the taxation was authorized and the manner of performance of a contract for the construction of erosion prevention works, which construction was the cause of the taxation as authorized. The appellees appeal from that part of the decree which concerns the collection of the front foot benefit tax on the Leonardos' lots, and the requirement that two additional lots be included in the taxing district.

Chapter 66, Acts of 1950 of the General Assembly authorized the County Commissioners of the State to set up special taxing districts for erosion prevention work in every subdivision of land in any county subdivided for residential and business uses, and abutting or bordering upon the Chesapeake Bay and tributaries, or upon any other stream or body of water in the State, as shown in plats recorded among the land records in the county. The act further provided that the erosion prevention works were authorized after written application of 75 per cent of the property owners in the district. To finance the project, the County Commissioners, acting as a District Council, were authorized to issue notes, certificates of indebtedness or bonds maturing serially, payable in fifteen years and guaranteed as to principal and interest by the county.

The act required a hearing to be held in connection with the plans and specifications and the award of a contract to the lowest responsible bidder, after the customary advertising. After construction of the erosion prevention works, the owners were to be subject to a benefit charge on each lot in the district according to the benefits received by each lot, as determined by the Commissioners after a public hearing. In addition, the act authorized an *ad valorem* tax against all the property in the district to meet payments of interest and principal on the county obligations and to pay for the maintenance and repair of the erosion prevention works. It further provided that the County Commissioners could reimburse themselves for expenses incurred in the administration of the project in an amount not to exceed two hundred dollars each, annually.

"Tall Timbers on the Potomac" is a residential subdivision abutting and bordering on the Potomac River in St. Mary's County. In 1951, the required 75 per cent of the lot owners petitioned the County Commissioners to have erosion prevention works constructed in their district. After a public hearing with respect to the plans and specifications, the county advertised for bids, and, on August 28, 1951, the county entered into a contract with the lowest responsible bidder, Neil MacDonald, whereby the contractor agreed to (a) construct approximately 2,150 linear feet of timber seawall at $23.00 per linear foot measured in place; (b) construct timber jetties spaced 30 feet on centers at $10.00 per linear foot, and (c) to place earth back-fill in place from the existing earth banks to the new seawall for $1.50 per cubic yard measured in place. According to the record, the surveying of the projects began in the early part of 1951, and the construction of the erosion prevention project was completed in February, 1953, and was duly accepted and paid for.

While the construction was in progress, approximately 150 feet of the seawall was damaged by storms. The plans and specifications called for a "free standing" wall. The County asked for a bid from the contractor for "tieing" the seawall to the shore and for straightening the seawall damaged by the storms. The bid was $3,000.00 for the extra work

which the County Commissioners concluded was reasonable and which bid they accepted on June 6, 1952. The authority for an award in extras was contained in the contract.

By reason of two decisions of this Court in February, 1951, with respect to the type of legislation which may be enacted at a "short session" of the General Assembly, serious doubt was cast upon the constitutionality of Chapter 66, Acts of 1950. Accordingly, that act was introduced in substantially the same form at the next regular session of the General Assembly following these Court decisions and was enacted as Chapter 277, Acts of 1953. All actions taken under the 1950 Act by any Board of County Commissioners were validated and confirmed by the provisions of this later act. At the time of the effective date of this later act on June 1, 1953, the erosion prevention works contract had been fully completed. Thereafter, the County Commissioners by resolution of August 11, 1953, authorized the issuance of serial bonds of the county in the principal amount of $100,000 to pay for the entire expense of the construction of the said project. The bonds were subsequently sold at a public sale. As disclosed by the record, the total cost of the project, including legal services, printing of the bonds and newspaper advertising, amounted to $97,160.31.

On October 13, 1953, the County Commissioners, acting as District Council for the Taxing and Assessment District of Tall Timbers on the Potomac, adopted a resolution in which they designated the territory within said district to bear the special taxation authorized by Chapter 277, Acts of 1953, by reason of the benefits accruing to certain lots within the said district. That resolution found that the waterfront lots had been benefited by the project in a ratio of two to one to the benefit of the non-waterfront properties in the district. A front foot benefit tax assessed on the said basis and an *ad valorem* tax of $2.50 per $100 of the assessable basis were levied on all the lots in the district.

Bills for the special taxation for the year 1954 were mailed to all of the lot owners in the district, and appellants, Leonardos, objected to the special levy on their lots Nos. 43 and 44. On July 6, 1954, the Leonardos filed a bill of complaint

in the Circuit Court for St. Mary's County, seeking an injunction to declare Chapter 66, Acts of 1950, and Chapter 277, Acts of 1953, unconstitutional. Thereafter, on October 5, 1954, eight of the residents of the District moved the court for permission to join as parties complainants in the Leonardo suit, and they were duly joined in the proceedings. These eight additional complainants were among those who petitioned the County Commissioners to have constructed the erosion prevention works in Tall Timbers on the Potomac. After a hearing in open court, the Chancellor passed a decree as above noted, and the respective appeals were noted.

I

The appellants first contend that the title of Chapter 277 of the Acts of 1953· is invalid under Article 3, section 29, of the Constitution of Maryland. Said section reads, in part, as follows: "* * * and every law enacted by the General Assembly shall embrace but one subject, and that shall be described in its title; * * *."

The appellants claim that the title is defective because: (a) the body of the act (sec. 161 (c)) requires a levy of *ad valorem* taxes upon all the assessable property in the county should the "benefit" and "district" taxes prove insufficient to meet the obligations upon the bonds issued; (b) said section 161 (c) contains certain penal provisions; (c) the body of the act provides for the allowance of personal expenses incurred by the County Commissioners because of erosion projects; (d) section 158 (b) provides a different method of selling bonds from the provisions of article 31, secs. 34, 35 and 36 (Code 1939); and none of these items is specifically mentioned in the title.

Section 29 of Article 3 of the Constitution has been involved in cases before this Court on numerous occasions. It has been included in the last three Constitutions of this State, and its purposes are to prevent the combination in one act of several distinct and incongruous subjects, and to inform the members of the legislature of the nature of the bills introduced, which are usually read to them by their titles only, and to permit the citizens of the State to know of proposed legis-

lation. The general rule of its construction is that every presumption favors the validity of the statute, and reasonable doubt is enough to sustain it. The appellants here assert no claim that the statute embraces more than one subject. The cases arising under this section of the Constitution relating specifically to the requirement that the subject be described in the title may be generally divided into those in which it is contended the title is not sufficiently descriptive, and those where it is claimed the title is misleading. This Court has consistently held that the Constitution is complied with if the title of the legislation *fairly* advises the legislature and the public of the real nature and subject matter of the legislation sought to be enacted. *Shipley v. State,* 201 Md. 96, 102, 93 A. 2d 67. In order to do this, it is unnecessary that the title be an abstract of the text of the proposed statute, nor need mention be made of the means and the methods by which its purpose is to be accomplished. *Bond v. Mayor and C. C.,* 116 Md. 683, 688, 82 A. 978; *Painter v. Mattfeldt,* 119 Md. 466, 87 A. 413.

Having these principles in mind and the above mentioned objections, we shall now examine the title to Chapter 277. It provides for seven new sections to Article 25 of the Code and then states in part:

> "* * * said new sections * * * to be under the new sub-title 'Erosion', authorizing the County Commissioners of this State to set up Special Taxing Districts for erosion prevention work and specifying their powers and duties for these purposes; * * *."

We think this title is sufficiently comprehensive to fairly advise the legislature and the public of the real nature and subject matter of the statute, and that it is not misleading. (a) The fact that it fails to mention the *ad valorem* tax is neither deceptive nor misleading. This is a detail incident and germane to the subject-matter of the act. (b) And the same applies to the penal provision, which is limited to those persons handling funds of the erosion projects, and to (c) the provision for the payment to the County Commissioners for expenses incurred in inspecting the projects. (d) We

also do not consider that the failure to mention the method of selling bonds in the title rendered it defective or misleading. Section 33 of Article 31 provides for the method of sale of bonds sold by "public bodies", unless the enabling act authorizing their issuance shall specifically exempt said bonds from the provisions of said section, or provides a different method for the sale of the bonds. Section 158 (b) does both. We think the method of the sale of the bonds was germane to "erosion prevention work" and was one of the "powers and duties" of the County Commissioners specified in the title as above noted. We fail to discover anything deceptive or misleading here.

The appellants also contend that the title is misleading in that it refers to "erosion prevention work", yet the body of the act names "residential and business properties abutting or bordering on rivers and streams in recorded subdivisions". The only reason assigned by the appellants that this is misleading is, "(t)he indication is that the act refers to erosion in the whole State of Maryland". We find no merit in this contention. The title refers to "erosion prevention work". The body of the act limits its application to business and residential subdivisions abutting or bordering on certain waters in the State. This does not present the situation of the body of a statute attempting to enlarge upon a specific limitation in its title as was the case in *Buck Glass Co. v. Gordy,* 170 Md. 685, 688, 185 A. 886, but the converse; so the appellants fail to sustain their argument that the title is misleading under this point.

The appellants make their final attack under this first heading by saying that Chapter 277 of the Acts of 1953 repealed sections 167 to 173 of Article 25, (the same being Ch. 66 of the Acts of 1950), and added seven new sections known as sections 156 to 162 to follow immediately after section 155 of the Code, 1951; that the 1951 Code numbered the provisions of Chapter 66 of the Acts of 1950 as sections 149 to 155, inclusive; and that the effect of the repeal of Chapter 66 of the Acts of 1950 by Chapter 277 of the Acts of 1953 was to remove sections 149 to 155 from the 1951 Code. They claim this results in a change in the numerical

sequence of the sections of the Code and contravenes that portion of section 29 of Article 3 of the Constitution that reads:

> "* * * And whenever the General Assembly shall enact any Public General Law, not amendatory of any section or article in the said Code, it shall be the duty of the General Assembly to enact the same, in articles and sections, in the same manner as the Code is arranged, * * *."

In passing Chapter 277, the legislature enacted the same under a new sub-title by article and in sections in the same manner as the Code is arranged. We think this fully complied with the constitutional requirement, and the fact that there are presently no sections 149 to 155, inclusive, in the 1951 Code does not violate this section of the Maryland Constitution.

II

The appellants next contend that Chapter 66 of the Acts of 1950 was unconstitutional and it was not rendered valid by Chapter 277 of the Acts of 1953. They claim that a very substantial part of the work of the erosion project had been completed when Chapter 277 was enacted and it was "illegal" for the legislature "to attempt to make good a project which had already been substantially completed", as it amounted to the taking of property without due process of law.

We see no necessity to pass upon the constitutionality of Chapter 66. Between the passage of the two acts, the Commissioners had begun work on the erosion project. Surveying began in 1951 and by December of 1952, a substantial part of the construction had been completed. At the time Chapter 277 was passed, the Commissioners had contracted for the work to be done, but had not issued the bonds nor levied the taxes. If we assume, without deciding, that Chapter 66 were unconstitutional, this action of the Commissioners would be without authorization and *ultra vires*. However as pointed out above, Chapter 277 specifically ratified and confirmed any action taken and things done by the Commissioners under the purported authority of Chapter 66.

There can be no question that a contract for this kind of construction is one that the legislature would have the power to sanction and authorize; and there was no disturbance of, or interference with, vested rights. In a situation of this kind, there can be no question that the legislature possesses the power to pass a retrospective law to make valid an *ultra vires* contract. In *O'Brian v. County Commissioners*, 51 Md. 15 (1879), this Court had before it a situation where work had been partially completed for street paving pursuant to a statute which, while the work was in progress, was declared unconstitutional. Curative legislation was passed, but the objection was raised that the *ultra vires* contract could not be made valid. At page 24 of the opinion this language appears:

> "If the Legislature possess the power to authorize one act to be done, it can by a retrospective Act, cure the evils which existed because the power thus conferred has been irregularly executed. *Thomson v. Lee County*, 2 Wall. 327; *People v. Mitchell*, 35 N. Y. 551.
>
> "In the same manner it has been decided in numerous cases, that the Legislature may render valid a contract made by a municipal corporation, though *ultra vires* at the time it was made, if the contract is one which the Legislature might originally have authorized. Cooley, 379-381, and notes.
>
> "This principle applies with peculiar force to the case of a contract relating to a work in which the public is interested, and for the public benefit, after it has been executed; provided it be a contract which the Legislature had the power to permit or sanction in advance."

See also *C. and P. Tel. Co. v. Balto. City*, 89 Md. 689, 714, 43 A. 784, 44 A. 1033; *Water Co. v. Havre de Grace*, 150 Md. 241, 253, 132 A. 768. We therefore conclude that Chapter 277 rendered valid the contracts for the construction of the erosion project made by the Commissioners, and there was no taking of property without due process of law.

## III

The appellants further claim that Chapter 277 violates section 54 of Article 3 of the Maryland Constitution. This section reads as follows:

"No County of this State shall contract any debt, or obligation, in the construction of any Railroad, Canal, or other Work of Internal Improvement nor give, or loan its credit to or in aid of any association, or corporation, unless authorized by an Act of the General Assembly, which shall be published for two months before the next election for members of the House of Delegates in the newspapers published in such County, and shall also be approved by a majority of all the members elected to each House of the General Assembly, at its next session after said election."

The appellants do not suggest that the erosion project was a "Work of Internal Improvement". Cf. *Bonsal v. Yellott,* 100 Md. 481, 60 A. 593; *Welch v. Coglan,* 126 Md. 1, 94 A. 384; *Baltimore and D. P. Railroad Co. v. Pumphrey,* 74 Md. 86, 21 A. 559. They limit their argument of this point to a claim that the project benefited only private interests, namely, the waterfront property privately owned; and, as Chapter 277 was not published as provided in said section 54, it is invalid. Again, if we assume, without deciding, that if a project of the nature of that under consideration benefited only private interests it would come within the purview of section 54, appellants cannot be successful in this line of attack, because the erosion prevention works at Tall Timbers on the Potomac were undoubtedly constructed in the public interest and welfare. Cf. *Dinneen v. Rider,* 152 Md. 343, 365, 136 A. 754. The fact that privately owned properties may benefit from the project does not bring Chapter 277 within the provisions of section 54. The Counties as well as the State have a special interest in seeing their boundaries maintained and not eroded away. Among the many public benefits to be derived from a project of this nature is the fact that it will preserve real estate and improvements thereon

for future taxation by public authority. We are, therefore, unable to discover any merit in this contention.

## IV

The appellants make the further claim that Chapter 277 is arbitrary, and in violation of the equal protection and due process clauses of the Fourteenth Amendment to the Federal Constitution. They say that section 158 (a) of Chapter 277 provides that a petition of seventy-five per cent of the property owners of the subdivision is required before the Commissioners can begin an erosion prevention project. They argue that if a subdivision were composed of eighty improved lots owned by twenty people, and twenty unimproved lots owned by twenty other people, the twenty people owning the unimproved lots could prevent a proposed project. They contend this renders the statute arbitrary and discriminatory on its face and is a denial of the equal protection of the law. Assuming the premise of this argument, we are unable to agree. The Equal Protection Clause guarantees that equal protection shall be given to all persons under like circumstances in the enjoyment of their civil and personal rights. But it does not preclude the States from resorting to reasonable classification for the purposes of legislation. *Tatlebaum v. Pantex Mfg. Corp.,* 204 Md. 360, 369, 370, 104 A. 2d 813. Without unduly prolonging this opinion, which, because of the many points raised, must be lengthy, we say that we are unable to discover anything arbitrary, unreasonable or discriminatory in the classification made, and hold the legislature had the power and authority to require a petition from seventy-five per cent of the property owners before an erosion prevention work should start, without violating the Equal Protection Clause of the Federal Constitution. *Fallbrook Irrigation Dist. v. Bradley,* 164 U. S. 112, 116; *Wampler v. Lecompte,* 282 U. S. 172; *U. S. Mortgage Co. v. Matthews,* 293 U. S. 232.

The appellants say further that Chapter 277 is "uncertain in meaning"; that it uses the language "territory abutting or bordering, etc."; and "(a) Statute uncertain in meaning is unconstitutional because it amounts to a taking of property

without due process of law." We have difficulty in discerning just what the appellants mean in assigning this rather unusual reason for attacking a statute as taking property without due process, but have set forth all they say upon the subject. As suggested in the appellee's brief, only a lifelong resident of the Sahara Desert could be confused by the meaning of a subdivision "abutting or bordering" on a body of water. We find no merit in this contention of the appellants.

## V

The appellants advance as another contention: "(a)s the benefit charges and the erosion tax were not levied on the entire subdivision, seventy-five per cent of the property owners in the entire district did not make a request to erect the erosion work." It will be unnecessary to consider this as it is in direct conflict with a stipulation made in the court below (R. E. 98).

## VI

The appellants next contend that the contract for the construction of the project was not awarded to the lowest responsible bidder. The contract was awarded to Neil MacDonald as a whole, and the appellants claim there were lower bids for a "severable part of the project". They claim the county paid MacDonald for 15,600 cubic yards of back-fill at the price he bid of $1.50 per cubic yard, while a Mr. Mattingly had bid $1.25 per cubic yard for the same. The short and simple answer to this is that it was stipulated below that the Mattingly bid was not considered because it was not in proper form and unaccompanied by a deposit as required (R. E. 96).

The appellants also contend that $3,000 was paid to MacDonald for extra work in straightening and tieing back the seawall, and this was not permitted by the contract. This is at complete variance with the facts. Article 5 of the contract authorized a charge for extra work when ordered in writing by the district council at a stated price. This extra work at the price named was ordered in writing by the council on June 6, 1952.

The appellants further claim that the extra work mentioned

just above was necessitated by MacDonald's negligence, and that MacDonald failed to furnish a bond as called for in the bids and the awarding of the contract. However, neither of these claims is sustained by the record.

## VII

Under this heading, the appellants complain that the contract awarded for the project was not properly carried out and performed. They list some five or six alleged variations from the plans and specifications. It seems unnecessary to name them separately as the ones supported by the record seem to be trifling in nature. The chancellor states: "In this case it is apparent that there were variations in the contract but with the explanation given, they would appear to be minor and with a valid reason existing therefor." With this finding, we agree. The inspector for the commissioners was informed of all proposed changes and a report thereof was made to the commissioners, who, after the completion of the project, accepted and paid for it. Here, there is no allegation of fraud which may vitiate a public contract after the work performed has been accepted. It is well settled that it is no defense to an assessment that the contractor did not carry out the contract for the work strictly according to its terms. The proper authorities must decide upon this, and if they accept the work, the acceptance, in the absence of fraud, is conclusive. *Baltimore v. Raymo,* 68 Md. 569, 577, 578, 13 A. 383.

## VIII

The appellants state as an additional assignment of error that the "benefit charges" and "erosion taxes" have not been properly and fairly assessed. They assert that all lots in the "front section" were "put on the same basis", and all lots in the "rear section" were "put on the same basis", without regard to value. (It may be well to note here that the entire special taxing district is composed of two sets of lots, both roughly perpendicular to the waterfront, with one of the sets abutting the water and the other set lying immediately to the rear. Each lot has the same width, and the same depth excepting some contiguous to the water where the water-line

meanders.) The appellants argue this made the assessments completely arbitrary as they were not made "on true evaluation". They claim this is a violation of due process and equal protection and the requirement of uniformity under Article 15 of the Maryland Declaration of Rights. This contention is limited to the "benefit" tax, as the *ad valorem* tax was based on the assessed value of the different lots. The argument, in effect, is that the levy of a special or local assessment must be based upon the value of the land from which the assessment is exacted. However, it loses sight of the fundamental theory of the basis for special or local assessments for benefits. They stand upon widely different grounds from general taxes. *Brooks v. Baltimore,* 48 Md. 265, 268. Special assessments are in the nature of a tax upon property levied according to *benefits* conferred on the property. The whole theory of a special assessment is based on the doctrine that the property against which it is levied derives some special benefit from the improvement. The justice of demanding the special contribution is supposed to be evident in the fact that the persons who are to make it, while they are made to bear the cost of a public work, are at the same time to suffer no substantial pecuniary loss thereby; their property being increased in value by the expenditure to an amount substantially equal to the sum they are required to pay. 14 *McQuillen, Municipal Corporations,* secs. 38.01, 38.31, (3rd Ed.). This Court has recognized the validity of such assessments on many occasions. The mode of assessment is a legislative question, subject to constitutional limitations. The mode may be committed to municipal authorities and the general rule is that the exercise of their discretion therein, if made according to a definite and just plan, will not be reviewed by the courts where neither fraud nor mistake appears. *McQuillen, op. cit.,* sec. 38.111. In some jurisdictions *ad valorem* assessments have been upheld, but they are certainly not required. *Dinneen v. Rider, supra.*

In the suit at bar, the enabling act placed discretion in the commissioners to make an assessment on the basis of benefits received, not on that of property value. The appellants neither assert nor attempt to prove that the benefits received

were not substantially in accord with their assessments. Since all the waterfront properties have equal widths, it was proper and reasonable to assume that control of erosion by waters of the Potomac River would benefit all the waterfront property in the district in an equal degree. Similarly, the non-waterfront lots, equal in width with all of the other lots, benefited, because without the erosion prevention work such properties in time could easily become waterfront lots and thereafter part of the bed of the river. The commissioners concluded that the waterfront properties had benefited in a ratio of two-to-one to the benefit of the non-waterfront lots, and placed the assessment on a front foot basis. Under a grant of power to assess property *benefited* by an improvement, municipal authorities are not confined to abutting property in making the assessment. *McQuillen, op. cit.,* sec. 38.72. It will be noted that the rate of assessment was uniform and equal upon each class of property benefited. Even if Article 15 of our Declaration of Rights applies to special assessments (which we do not hold), there has been no violation thereof.

It will also be noted that the enabling act provides that each property owner shall be notified before the assessment is made and granted a hearing thereon; and, of course, there is always a further right to apply to the courts to relieve arbitrary or capricious action. When these occur, one cannot be said to have been deprived of his property without due process of law; and whenever the law, as in this case, operates alike on all persons and property, similarly situated, equal protection cannot be said to be denied. *Walston v. Nevin,* 128 U. S. 578.

The appellants make a further claim that certain of the lots in the subdivision were not included in the taxing district, which resulted in an increased burden on the remaining lots. They neither assert nor attempt to prove that the lots not so included received special benefits from the improvement. Unless property receives a benefit from the improvement, no special assessment may be lawfully levied against it. *United R. and E. Co. v. M. and C. C. of Balto.,* 127 Md. 660, 670, 96 A. 880; *McQuillen, op. cit.,* sec. 38.31. In the establish-

ment of improvement districts, within the restrictions of the applicable law, broad discretion is vested in the municipal authorities, and this discretion is conclusive in the absence of evidence that its exercise was procured by fraud or that it is manifestly arbitrary or unreasonable, or that the assessment is palpably unjust and oppressive. *McQuillen, op. cit.*, secs. 38.55, 38.56. The record fails to disclose any reason why the commissioners were not justified in eliminating the lots they did from the taxing district.

## IX

Appellants make the further contention that the separate taxing and assessment district created by the Commissioners in this instance was not authorized and is illegal. They claim the enabling act, section 156, required that *all* property within the subdivision known as "Tall Timbers on the Potomac" *must* be included within the taxing district; and, as the Commissioners had failed to include several lots of said subdivision within the taxing district, the taxing district is illegal. We think a reading of the act refutes this argument. The title states the commissioners are authorized to "set up" special taxing districts; section 156 provides that territory *within* every recorded subdivision of land in this State, subdivided for residential or business uses, and abutting or bordering upon any stream or other body of water is created into separate taxing and assessment districts, each district to bear the name of the subdivision *out of which* it is created; section 157 authorizes the county commissioners to act as the district council for each taxing district and empowers them to acquire property, either by condemnation or otherwise, to prevent erosion; section 158 provides for the construction of erosion prevention works and the issuance of bonds to pay for them; section 159 requires notice to the property owners and a hearing after the plans and specifications have been completed and the procedure for the letting of contracts; and sections 160 and 161 provide that after the completion of an erosion prevention project and notice to the landowners the commissioners, acting as the district council, shall fix and levy a benefit charge upon all real estate in said district bene-

fited by "erosion prevention work", and an *ad valorem* tax against "all the assessable property in each district so improved." We think a reading of these sections together clearly shows a legislative intention to authorize the county commissioners to create taxing and assessment districts for erosion prevention works from territory within recorded residential or business subdivisions abutting or bordering on the Chesapeake Bay and its tributaries or any other stream or body of water in this State. There are many subdivisions throughout the State that abut on water, with comparatively few of the lots actually bordering on the water. It is possible that some lots included in a subdivision might not receive any special benefit from an erosion prevention project, although many (as in the present case), in addition to those abutting on the water, would receive such benefits. Under our ruling made above, those lots which received no such benefits could not be assessed. However, if appellants' version be correct, *all* of the lots of the subdivision must be included in the taxing district; consequently, the assessment would be void as to any lot not specially benefited. We are unable to conclude that the legislature intended such an absurd result.

We are, therefore, of the opinion that the benefit assessment levied by the commissioners in this case is valid, with the exception of that levied on the two lots belonging to Ercole Leonardo and wife; and the *ad valorem* tax levied by the commissioners is valid against all of the lots in the taxing district as created by the commissioners. *Dinneen v. Rider, supra.*

X

We come now to the cross-appeal. As the Leonardos had previously constructed a private seawall in front of their lots, the appellees concede the chancellor was correct in decreeing the two lots owned by the Leonardos were not properly subject to the benefit tax. However, they request that the decree be modified to the extent that if the commissioners acquire an easement in, or ownership of, the private seawall of the Leonardos, the commissioners thereafter could collect the

benefit tax from the Leonardos or the subsequent owners of the two lots. We think the decree should be so modified. As the decree now reads, the commissioners are perpetually enjoined from collecting the benefit tax on these two lots. If, in the future, the commissioners acquire an easement in, or ownership of, the seawall, there is no just reason why they should be prevented from then collecting the assessment.

As stated at the beginning, the chancellor conditioned the collection of the assessments upon the commissioners bringing into the taxing district two additional lots that they had not so included. These two lots are at the extreme southern edge of the subdivision and at the time of the creation of the taxing district they were protected by seawalls considered by the county surveyor in 1951 as adequate. We pointed out above that in creating the improvement districts a broad discretion is vested in the commissioners, and stated the rule as to when their determinations will be reviewed. No fraud is alleged, and we are unable to say their action excluding these two lots was manifestly arbitrary or unreasonable. We therefore, conclude the chancellor was in error in conditioning his decree upon the requirement that these two lots be brought into the taxing district, and the decree should be so modified. In all other respects than the two modifications mentioned, the decree is affirmed.

> *Decree affirmed in part and modified in part, and the cause remanded for modification of the decree in accordance with this opinion. The appellants to pay the costs.*