638 A.2d 74

**Raymond J. WILLIAMS et al.**

v.

**ANNE ARUNDEL COUNTY, Maryland et al.**

**No. 56, Sept. Term, 1993.**

Court of Appeals of Maryland.

Feb. 14, 1994.

Reconsideration Denied April 8, 1994.

Robert J. Booze, argued and on brief (L. Dale Burgmeier, Burgmeier and Downer, on brief), Annapolis, for petitioner.

Judson P. Garrett, Jr., County Atty., argued and on brief (Jamie Baer Insley, Sr. Asst. County Atty., on brief), Annapolis, for respondent.

Frederick C. Sussman, Wright, Sussman & Elmore, P.C., on brief, Annapolis, amicus curiae.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE *, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

This case involves the long-standing practice in Anne Arundel County of creating special community benefit tax districts in residential subdivisions in order to finance certain local improvements and services. Specifically, this case concerns Anne Arundel County Code (1985, 1993 Supp.) (A.A.Code), Art. 6, § 2–104(f–3) which creates the Cape St. Claire Commu-

---

* McAuliffe, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

nity Benefit District (the District). Petitioners own real property in the District. They seek a judgment declaring invalid the ordinance creating the District, and they seek to enjoin collection of any tax levied under the authority of that ordinance by the Anne Arundel County Council on property in the District. Their principal contention is that the tax is not for a public purpose. The requested relief was denied by the Circuit Court for Anne Arundel County and, in an unreported opinion, by the Court of Special Appeals. For reasons hereinafter stated, we shall affirm.

The legal and historical background of the tax district concept, particularly as practiced in Anne Arundel County, will assist in understanding the issues presented here.[1]

# I

It appears that the earliest special community benefit tax district in Anne Arundel County (the County) was Herald Harbor on the Severn, created by Chapter 261 of the Acts of 1929 for the purpose of constructing and maintaining roads within that community, as defined. Under the format there employed the Board of County Commissioners of Anne Arundel County (the Commissioners) appointed a five person board from among the area's residents, and that board annually recommended to the Commissioners the amount to be raised by special tax in the district to carry out the statutory purpose.

By Chapter 366 of the Acts of 1939 the General Assembly authorized the Commissioners

"to establish from time to time special zones ... and to furnish and provide special privileges or benefits to persons or property in such zones, and to levy special taxes or assessments upon property in such zones receiving special

---

1. An amici curiae brief, filed on behalf of ten community associations in various areas of Anne Arundel County and presenting the history and scope of the practice, has been most helpful to the Court.

benefit to pay the costs of furnishing ... such special privileges or benefits."

Exercise by the Commissioners of the power conferred by Chapter 366 was conditioned on a petition, seeking creation of the zone, by a majority of the taxpayers therein and on publication.

The County has been a home rule county under Maryland Constitution Art. XI–A since November 1964. Article XI–A is implemented by the Express Powers Act, Md.Code (1957, 1990 Repl.Vol., 1993 Cum.Supp.), Art. 25A. One of the powers of chartered counties is to levy on land, improvements and personal property. Art. 25A, § 5(O). That provision was amended by Chapter 646 of the Acts of 1949 to confer power "to establish ... special taxing areas for any of the purposes enumerated in Article 25A...." [2]

At this time there are forty-two special community benefit districts located throughout the County. Each was originally created by a public local law of the General Assembly, by a resolution of the Commissioners, or by an ordinance of the County Council. These enactments are codified in A.A.Code, § 2–104(b) through (bb).[3]

Cape St. Claire is a residential community of some 2200 homes on the south shore of the Magothy River, near its entrance into the Chesapeake Bay. Development of Cape St.

---

**2.** That amended paragraph in present § 5(O) of the Express Powers Act reads in its entirety as follows:

"To levy and collect taxes for the organization, operation, maintenance of libraries, fire and ambulance services, and other municipal services and to authorize the purchase, sale, construction, maintenance, and operation of all real and personal property necessary or incidental to such services, and to establish, modify, amend and abolish special taxing areas for any of the purposes enumerated in this article, except that nothing herein contained shall be construed to permit the modification or abolition of existing special taxing areas performing municipal services, (other than furnishing fire protection or library service) and governed or administered by a citizen's committee or a commission elected or appointed independently of the county council."

**3.** All references to sections of the A.A.Code are to Art. 6 thereof.

Claire was begun in the 1940s by the River Bay Company which recorded subdivision plats and imposed covenants running with the land. The development plan included certain community property, consisting primarily of several beaches and parks. Recorded covenants require lot owners to pay a fee, apparently fixed at ten dollars per year, to the River Bay Company or its successor for the maintenance of community property. Title to the community property has been transferred to the Cape St. Claire Improvement Association, Inc. (the Association), a private membership corporation. Currently all persons owning property on the platted areas comprising Cape St. Claire are eligible for membership in the Association, but membership in the Association is limited to such persons.

In February 1989 a majority of the owners of the lots in Cape St. Claire petitioned the County Council, pursuant to A.A.Code § 2–103, for the establishment of a special community benefit district in Cape St. Claire. The District was created by Bill No. 19–89, enacted April 24, 1989, and codified as A.A.Code, § 2–104(f-3). Its purposes are:

"(i) maintenance of community property, including lawn care, trash removal, repair, lighting, paving, and erosion prevention;

"(ii) special security for community property;

"(iii) acquisition, improvement, and construction of real and personal community property; and

"(iv) funding administrative expenses incidental to carrying out these purposes, including mailing, secretarial, auditing, insurance, and legal costs."

§ 2–104(f-3)(2). The special community benefit tax in the District is "a uniform assessment for each real property tax account." A.A.Code § 2–106(d)(3).[4]

---

**4.** The uniformity requirement of Art. 15 of the Maryland Declaration of Rights, relating to ad valorem property taxes, does not apply to special or local benefit assessments. The latter may be, but are not required to be, based upon ad valorem assessments. *Leonardo v. County Comm'rs*

"Unless otherwise provided by law, special taxing district budget requests [are] prepared by the board of directors of the civic or community association administering the district and submitted to the property owners for their comments...." A.A.Code § 8–106(a). Final budget requests must be submitted to the Anne Arundel County Budget Office on or before January 31 of each year. § 8–106(b)(1). These budget requests must include "[a] detailed listing of the purposes to which the special taxing district funds are to be applied." § 8–106(c)(1). The budget request must also state "the rate of special taxing district tax." § 8–106(c)(4).

The County charter embodies an executive budget system. A special taxing district must satisfy the County Executive that the requested appropriations be included in the County's annual budget and appropriation ordinance. *See* County Charter § 706 and, *e.g.*, Bill No. 54–93 (the County Budget and Appropriation Ordinance for the fiscal year ending June 30, 1994). The County Council, with certain exceptions not here relevant, may decrease or delete any item from the budget as proposed, but the County Council may not "increase any expenditure recommended by the County Executive." Charter § 709. A special community tax district's annual tax must also be included in the ordinance of levy for special tax districts. *See, e.g.*, Bill No. 55–93 for the fiscal year ending June 30, 1994.

Special benefit taxes are collected and enforced in the same manner as County real property taxes. A.A.Code § 2–107. The County Controller deposits a special tax district's tax collections into a special account. A.A.Code § 2–108(a). The Controller releases these collections to "[t]he Treasurer or other fiscal officer of each special community benefit district." § 2–108(b). Those recipients must be bonded. *Id.* Disbursements are made monthly after deduction of a fee paid to the

---

of *St. Mary's County*, 214 Md. 287, 306–09, 134 A.2d 284, 293–94, *cert. denied*, 355 U.S. 906, 78 S.Ct. 332, 2 L.Ed.2d 260 (1957); *Leser v. Philip Wagner, Inc.*, 120 Md. 671, 680, 87 A. 1040, 1042, *aff'd*, 239 U.S. 207, 36 S.Ct. 66, 60 L.Ed. 230 (1913); 63 Op.Att'y Gen. 16 (1978).

general fund of the County of five percent of the collections, subject to an annual ceiling of $1,000 per tax district. § 2–108(c). Under pain of fine or imprisonment for violation of the restriction, "[f]unds disbursed to a special community benefit district shall be expended only for the purposes for which appropriations have been made in the budget as enacted by the County Council." § 2–108(d) and (e).

It is clear from the foregoing that the legal theory underlying the forty-two special community benefit districts in Anne Arundel County is that they are special benefit assessment areas. Thus, the special taxes levied in those areas are special benefit assessments. "The use of such 'special assessments' has a long history in the United States." O. Reynolds, Jr., *Local Government Law* § 99, at 300 (1982) (footnote omitted). In *Gould v. Mayor & City Council of Baltimore*, 59 Md. 378 (1883), this Court contrasted special assessments with the general property tax, saying:

> "The right to make such assessments is undoubtedly an exercise of the taxing power, but an assessment thus made differs from a general tax levied for State and city purposes. The latter is a tax imposed on all persons within the territorial limits according to the value of their property, in consideration of the protection, which the government affords alike to all. A local assessment, on the other hand, is a tax levied occasionally as may be required upon a limited class of persons interested in local improvement, and who are presumed to be benefited by the improvement over and above the ordinary benefit which the community in general derive from the expenditure of the money. In the payment of the assessment thus made, the adjacent owner is supposed to be compensated by the enhanced value of his property, arising from the improvement."

*Id.* at 380.

"In order to justify a special assessment for a local improvement ... there must be both a public purpose and a special benefit to the properties to be assessed over and above that accruing to the public." *Montgomery County v. Schultze*, 302

Md. 481, 489, 489 A.2d 16, 20 (1985). *See also Silver Spring Memorial Post No. 2562, Veterans of Foreign Wars v. Montgomery County,* 207 Md. 442, 448, 115 A.2d 249, 251 (1955). One treatise expands on the concept, as follows:

"In order to justify a local assessment the improvement must be a public one; that is, it must be one which confers a general benefit upon the public at large, and which, therefore, the public acting through its government may construct without the consent of the particular individuals affected thereby. Local assessment for benefits is a form of taxation and the very nature of taxation implies that it is for a public interest. An improvement which lacks this element is essentially a private improvement, and no matter how useful or advantageous it may be, the public cannot compel its construction, nor can it pay therefor by funds raised by general taxation."

1 W. Page & P. Jones, *Taxation by Local and Special Assessments* § 283, at 439 (1909) (footnotes omitted).

Although special benefit assessments were first utilized to finance certain capital improvements, typically elements of the infrastructure of local government, special benefit assessments may also be used to finance the operating expenses of local government for services beneficial to property in an area. *See Pumphrey v. County Comm'rs of Anne Arundel County,* 212 Md. 536, 130 A.2d 297 (1957) (rejecting landowner's challenge to a benefit assessment for garbage collection imposed against realty occupied by tenant); *City of Seattle v. Rogers Clothing for Men, Inc.,* 114 Wash.2d 213, 787 P.2d 39 (1990) (sustaining special assessment for promotional activities, cleaning, decorating, and security in the central business district of Seattle). *See generally* O. Reynolds, Jr., *supra,* § 15, at 38.

## II

In the instant matter the County and the Association are the defendants. Following creation of the District, the Association annually has submitted to the County a requested bud-

get and tax for the District. For the fiscal year ending June 30, 1990, the District tax was $29.09 per tax account, for fiscal 1991, $29.45, and for fiscal 1992, $30.01.

An affidavit submitted by the Association president reflects that the tax monies through June 30, 1992 were used for:

● Property maintenance, including grass cutting, tree trimming, trash bags and providing for dumpsters and their periodic emptying;

● Construction of a recreation pier;

● Outdoor lighting at beach facilities;

● Security patrolling (shared with others);

● Providing sanitary facilities at community properties;

● Constructing a storage facility for maintenance equipment;

● Removal of debris from community property;

● Installation and maintenance of outdoor pay telephones;

● Professional costs, including insurance, accounting, and legal, associated with the foregoing;

● Governmental fees and taxes;

● Administrative costs, including postage and shared secretarial and office expenses.

The circuit court decided this action by granting the County's second motion for summary judgment which was filed on the third court day (the fifth calendar day) prior to the trial date and was argued on the trial date without any written response to the motion by the petitioners. The trial court considered the facts stated in argument by petitioners' counsel as a proffer of what the petitioners could demonstrate in opposition to summary judgment. On that basis the circuit judge in essence concluded that there was no dispute of material fact.

### III

Petitioners primarily contend that the acquisition and maintenance of the Association's community property cannot,

as a matter of law, satisfy the public benefit requirement for a special benefit assessment because the use of the private property is limited to owners and occupants of lots in the subdivision, and presumably, their invitees. Petitioners say that this is a private use and that the services funded by the special assessment are not available to the general public. Relying on the 1909 treatise, *Taxation by Local and Special Assessments, supra,* §§ 283, 390, and 393, petitioners assert that there are three requirements in order for a local improvement to be regarded as public, namely, it must confer a general benefit on the public at large, it must be of a type that would justify the expenditure of general tax revenues, and it must be owned by or subject to an easement by the unit of local government assessing for the benefit. We disagree. Maryland law on the subject is far more flexible than petitioners' proposed criteria.

"What is a public purpose for which public funds may be expended is not a matter of exact definition; it is almost entirely a matter of general acceptance." *Finan v. Mayor & City Council of Cumberland,* 154 Md. 563, 565, 141 A. 269, 270 (1928). "[T]he line of demarcation" between a permissible public purpose and an impermissible private purpose "is not immutable or incapable of adjustment to changing social and economic conditions that are properly of public and governmental concern." *City of Frostburg v. Jenkins,* 215 Md. 9, 16, 136 A.2d 852, 855 (1957). Illustrating a private purpose, in violation of Art. 15 of the Declaration of Rights, was the tax levied "upon the property of the citizens of Talbot County, to pay to certain residents of that county the claims due to them by an insolvent railroad company." *Baltimore & E. Shore R.R. v. Spring,* 80 Md. 510, 517, 31 A. 208, 210 (1895).

This Court has said flatly that "the constitutional term 'public use' is not synonymous with physical use or access by the general public." *Prince George's County v. Collington Crossroads, Inc.,* 275 Md. 171, 187, 339 A.2d 278, 286 (1975). Similarly, "the public character of a condemnation is not necessarily changed because a private entity will own the property." *Id.* The decisions of this Court furnish multiple illustrations of expenditures of public funds for public pur-

poses despite the fact that there was also a benefit to privately owned property from which the public at large could rightfully be excluded by the private owner.

Decisions involving public assistance to private business in order to stimulate or sustain economic activity and employment have approved those objectives as public purposes. *See Reyes v. Prince George's County,* 281 Md. 279, 306–08, 380 A.2d 12, 27–28 (1977) (finding employment of 400 persons as part of public purpose in approving revenue bond refinancing of obligations of private partnership that owned arena); *Wilson v. Board of County Comm'rs of Allegany County,* 273 Md. 30, 51, 327 A.2d 488, 495–99 (1974) (revenue bond financing of pollution abatement equipment for private employer served public purpose both by abating air and water pollution and by "tying the industry more closely to its present location"); *Grinnell Co. v. City of Crisfield,* 264 Md. 552, 559, 287 A.2d 486, 489 (1972) (sale and lease back financing of addition to paint brush manufacturing plant to relieve unemployment served public purpose); *Lerch v. Maryland Port Authority,* 240 Md. 438, 452, 214 A.2d 761, 765–68 (1965) (revenue bond financing of office building to be tenanted by private businesses associated with port of Baltimore served public purpose of encouraging increased trade); *Jenkins,* 215 Md. at 16–17, 136 A.2d at 855–56 (industrial development revenue bond financing of privately owned lingerie factory promoted employment and thereby served public purpose).

■ Similarly, a public purpose is served when private property is condemned for resale to private business in the form of sites in an industrial park, *Collington Crossroads,* 275 Md. at 190, 339 A.2d at 288, and when, as part of a comprehensive plan for port redevelopment, land is condemned to construct wharves, docks, piers, and warehouses to be leased to private businesses. *Marchant v. Mayor & City Council of Baltimore,* 146 Md. 513, 522, 126 A. 884, 887 (1924).

■ The imposition of a one time tax on attorneys in order to fund the creation of a mutual insurance company writing legal malpractice coverage in a market that was

otherwise restrictive served a valid public purpose under Art. 15 of the Declaration of Rights by keeping an adequate supply of legal services available to the public. *Ogrinz v. James,* 309 Md. 381, 392–94, 524 A.2d 77, 83–84 (1987). Encouraging the recruitment and retention of police officers and fire fighters by indemnifying them with public funds for their legal costs in successfully defending against charges of criminal offenses or departmental violations is a public purpose. *Snowden v. Anne Arundel County,* 295 Md. 429, 439, 456 A.2d 380, 385 (1983). And when private residences along a street are specially benefited by, and specially assessed for, the installation of public water and sewer in the street, the general public in the local governmental unit imposing the special assessment is also benefited, even though individual members of the general public are not free to enter the homes in order to make use of the sewer and water service. *Cf. Dinneen v. Rider,* 152 Md. 343, 366, 136 A. 754, 763 (1927) (where water and sewer installations were to be financed by connection charges and by benefit assessments on abutting owners, with any ultimate deficiency to be raised by the countywide ad valorem property tax, the benefit to the members of the class last referred to was "the remoter local or political interest of all the taxpayers in the general public welfare of the county as enhanced by public improvements in any of its parts ...").

Here, the benefit to the general public is the same as that arising from any special benefit assessment. The 2200 properties in the District are presumed to enjoy an increase in value as a result of the special benefits conferred. *See Leser v. Philip Wagner, Inc.,* 120 Md. 671, 677, 87 A. 1040, 1042 (1913); *Burns v. Mayor & City Council of Baltimore,* 48 Md. 198, 204 (1878). The increase in value of the properties in the District from the special benefits conferred also benefits the taxpayers of the County at large, just as the availability of employment in the industrial development cases benefits the community at large. That general benefit is reinforced in the County by the total scheme of special community benefit districts. The County Council could, within its discretion, view that total scheme as enhancing the assessable basis and

the quality of life countywide, and thereby promoting the County as an attractive place in which to live and work.

■ The legislative judgment in levying benefit assessments on the District for the purposes described in A.A.Code § 2–104(f–3)(2) is entitled to the highest deference. "[I]n the absence of a showing of arbitrary action and plain abuse of power," the legislative body's decision is final. *Pumphrey,* 212 Md. at 542, 130 A.2d at 300. "And an assessment, if imposed according to a definite and just plan, will not be disturbed where neither fraud nor mistake appears." *Schultze,* 302 Md. at 490, 489 A.2d at 20.

■ To support their narrow and rigid approach to public purpose, the petitioners rely on a real property tax exemption case and on an out-of-state authority. In *Lodge # 817, Order of Elks v. Supervisor of Assessments of Wicomico County,* 292 Md. 533, 439 A.2d 591 (1982), an exemption from real property taxes was denied to a golf course "used solely for the enjoyment of Lodge members. . . ." *Id.* at 539, 439 A.2d at 594. Under the exemption statute there involved, Md.Code (1957, 1980 Repl.Vol.), Art. 81, § 9(e), to qualify for exemption the property (1) had to be owned by a nonprofit benevolent organization and (2) be "actually used exclusively for and necessary for charitable, benevolent, or educational purposes. . . ." *Id.* at 538, 439 A.2d at 592. The Elks's golf course failed the second condition. Exemptions from taxation are strictly construed, *id.* at 537, 439 A.2d at 593, a rule that is the antithesis of the presumption of validity accorded the legislative judgment specially to assess. *Order of Elks* does not stand for the proposition that a public purpose is not served unless property is open to the public generally.

Petitioners also take comfort from *Opinion of the Justices of the Supreme Judicial Court,* 560 A.2d 552 (Me.1989), in which the court advised the legislature that a bill that permitted maintenance of, including snow removal from, private roads by municipalities violated the public purpose limitation of the Maine Constitution. To the extent that the decision deals with bona-fide financing by special benefit assessments

of the maintenance of roads in a subdivision, privately owned by a community association but serving the same ingress and egress function as would public streets, the decision is inconsistent with Maryland law reviewed above. The longstanding and widespread practice in the County of levying special benefit assessments in order to maintain private community roads reflects "general acceptation" that the levy is for a public purpose. *See Finan,* 154 Md. at 565, 141 A. at 270. *See* the provisions in A.A.Code § 2–104 for the maintenance of non-County owned roads in Annapolis Roads, subsection (c)(2)(i); Arundel-on-the-Bay, (d)(2)(ii); Bay Highlands, (e)(2)(i); Columbia Beach, (h)(2)(v); Fair Haven Cliffs, (j–1)(2)(i); Franklin Manor, (k)(2)(ii); Gibson Island, (*l*)(2); Herald Harbor, (m)(2); Hillsmere Estates, (n)(2)(i); Hunter's Harbor, (o)(2)(i); Long Point on the Severn, (q)(2)(ii) and (iii); Owings Beach, (t)(2)(i); Oyster Harbor (u)(2)(i); Selby on the Bay, (v)(2)(i); Severndale, (v–2)(2)(i); Shoreham Beach, (w)(2)(i); Snug Harbor, (x)(2)(i); South River Manor, (x–2)(2)(iv); Steedman Point, (y)(2); Venice Beach (aa)(2)(iv); and Woodland Beach, (bb)(2)(i) and (ii). We decline to follow the Maine decision.

■ Petitioners also cite *Leonardo v. County Comm'rs of St. Mary's County,* 214 Md. 287, 134 A.2d 284, *cert. denied,* 355 U.S. 906, 78 S.Ct. 332, 2 L.Ed.2d 260 (1957), as support for their theory that the assessing governmental unit must own or have an easement in the improvement, but that is not a teaching of *Leonardo.* The case involved a special benefit assessment for the repayment of bonds, guaranteed by St. Mary's County, the proceeds of which were used to build a seawall. The Leonardos, property owners within the assessment district, had already protected their property with a seawall built to county standards and paid for by their own funds. This Court held that the Leonardos "were not properly subject to the benefit tax," because they did not benefit from the improvement. 214 Md. at 310, 134 A.2d at 296. An injunction, perpetually enjoining the County Commissioners from collecting the benefit tax on the Leonardos' property was modified, however, because of the possibility that the county

might acquire the privately constructed segment of the sea-wall. *Id.* at 311, 134 A.2d at 296.

## IV

Next, the petitioners fall back to a position from which they aim their fire at the administrative expenses of the Association. One of their volleys is a legal argument, while the other is ostensibly factual.

## A

The legal argument's premise is that the special community benefit tax districts in the County have no express powers and, petitioners assert, can have no implied powers. We agree that the District is simply an assessment area. From this, the petitioners conclude "that, as a matter of law, administrative expenses may not be paid from a special benefit tax," and that "the overhead expenses of the [Association], a private corporation, are not and can not be, incidental to the *County's* exercise of its express or implied powers." Appellants' Brief at 20–21. That conclusion does not follow from the legal distinction that petitioners emphasize, because here the distinction is irrelevant.

The Association is the vehicle or instrumentality that the County Council has recognized to administer and expend the special benefit assessments imposed and collected by the County. The County Council ordains the purposes for which those assessments may be expended. In the District those purposes expressly include "funding administrative expenses incidental to carrying out [the previously stated] purposes, including mailing, secretarial, auditing, insurance, and legal costs." A.A.Code § 2–104(f–3)(2)(iv). There is no need here to consider the extent to which the Association may imply authorization to expend tax funds for administrative expenses incidental to the other purposes for which the District is created. The authorization is express.

B

What petitioners present as a factual attack on the administrative expenses included in the assessment evolves into a question of the sufficiency of the proof to defeat summary judgment in this case. The starting point is the contention that the value of petitioners' property was not "increased in an amount substantially equal to the amount of tax funds spent on administrative expenses." Appellants' Brief at 21 (footnote omitted). We have recognized in *Schultze*, 302 Md. at 491, 489 A.2d at 20, that "if an assessment is excessive and, therefore, results in the property not being benefited by the improvement to an extent substantially equal to the amount of the assessment, the owner would thereby be deprived of property in violation of constitutional requirements."

There are cases in which it is apparent from the particular improvement or service and the assessment that the required approximate equality has not been achieved between the benefit to particular property and the amount assessed against it. For example, in *Schultze, supra,* a front foot benefit assessment was imposed against twenty-five properties that abutted a segment of road that had been widened. The assessment was calculated to recover all of the cost of the project but the project was designed to enhance the road's "utility as a cross-county connector road, replacing the need for a long proposed freeway." 302 Md. at 486, 489 A.2d at 18. In *Leonardo,* discussed *supra,* the seawall project did not benefit property that had already been protected by a privately erected seawall that conformed to project standards. Similarly, thé right-of-way of a streetcar company in the bed of a major downtown street in Baltimore was not enhanced in value by the repaving of the street. *United Railways & Elec. Co. v. Mayor & City Council of Baltimore,* 127 Md. 660, 96 A. 880 (1916). And, where the assessment for the cost of water and sewer line extensions into a subdivision of single family dwelling lots was based on the front foot basis, an irregularly shaped lot having almost twice the frontage, but approximately the same area, as the average of the other lots in the subdivision, does not

receive double the benefit from the project that the other lots receive. *Washington Suburban Sanitary Comm'n v. Evans*, 62 Md.App. 577, 490 A.2d 749 (1985). But the instant assessment does not fall within the class of cases described above.

To generate their valuation issue, petitioners rely on an answer by a property owner-affiant to an interrogatory. That answer described the right to use community property as an easement appurtenant to the owner's property. The answer recognized that the value of that right is dependent on the value of the community property itself. The answer also acknowledged that the value of the community property "is affected by the physical condition of the property itself," but the answer opined that "the value of the community property . . . is not affected in any way by the identity or financial condition of its owner." By "financial condition" the affiant referred to "the ability to purchase insurance, legal services, secretarial services, auditing services, mailing supplies, and other 'administrative' services and supplies."

Initially we note that the affidavit supporting this interrogatory answer was made on knowledge, information and belief and, thus, is deficient as an opposition to summary judgment. Maryland Rule 2–501; *White v. Friel*, 210 Md. 274, 280, 123 A.2d 303, 305 (1956).

Secondly, the answer does not affirmatively show that the affiant is competent to testify to the matters stated in the affidavit, or that the opinion expressed therein would be admissible in evidence. *See* Maryland Rule 2–501(c). The affiant does not present any qualifications as an expert in valuing real estate. The opinion rests solely on the affiant's status as an owner. This Court permits an owner of realty to testify to the value of that owner's own property because of the owner's familiarity with the property. *Brannon v. State Roads Comm'n*, 305 Md. 793, 801–03, 506 A.2d 634, 639 (1986); *Mayor & City Council of Baltimore v. Schreiber*, 243 Md. 546, 553, 221 A.2d 663, 666 (1966). But, "[t]he permissible scope of the owner's testimony is defined by the foundation supporting the admissibility of his valuation, *i.e.*, his familiarity with the

property." *Brannon,* 305 Md. at 803, 506 A.2d at 639. In the instant matter the affiant's opinion is not limited to the value of the affiant's own property, and the reason given to support the opinion would apply universally to all dominant real estate enjoying the use of community property, whether in the District or elsewhere.

In any event, if we assume, *arguendo,* an affidavit in proper form presenting an admissible opinion, the opinion expressed is legally insufficient to generate an issue of fact concerning value that would defeat summary judgment. The opinion in essence presents a valuation theory under which the direct labor costs applicable to, and the costs of personalty consumed in, the maintenance of the community property contribute to the value of the community property and thereby to the dominant land, but that indirect costs of maintenance do not.

Supporting the motion for summary judgment is the County Council's appropriation for the District's special benefits and the levy of the special benefit assessment. Those actions include a legislative determination that the 2200 assessment accounts in the District were respectively benefited by the special services, including the indirect costs thereof, by approximately $30. That legislative determination is presumed to be correct. That rate will not be judicially disturbed "where neither fraud nor mistake appears." *Schultze,* 302 Md. at 490, 489 A.2d at 20. *See also Murphy v. Montgomery County,* 267 Md. 224, 236–37, 297 A.2d 249, 256 (1972).

The opinion of the property owner-affiant that the indirect costs associated with the special services in the District do not contribute to the value of homeowners' properties in the District is legally insufficient to defeat that presumption of validity. Even if we assume that the most qualified real estate expert could calibrate the valuation of residences in the District, with and without the services, within a tolerance of $30, that would not support a finding that the assessment was fraudulently or mistakenly levied. As a matter of law it was within the reasonable discretion of the County Council to conclude that a $30 assessment per lot equalled, or was

exceeded by, the value of the benefit to a property in the District of the direct services and indirect costs to be rendered and paid during the forthcoming tax year. No reasonable fact finder could conclude to the contrary.

The basis on which the circuit court granted the County's motion for summary judgment in this case was essentially that last set forth above. The circuit judge said that "there has to be a cost related to the ... doing these services. And that requires salaries, insurance, and other administrative necessities."

V

We turn now to a contention based upon A.A.Code § 2–102(e) which provides that:

"the administration of a special community benefit district shall be conducted by a civic or community association that:

"(1) Is an incorporated association;

"(2) Provides for membership for each property owner in the district; and

"(3) Represents a majority of property owners in the district."

The contention is that, in order to administer the tax funds, the Association must affirmatively show, apparently annually, that it is authorized by a majority of the property owners in the District to represent them.

The undisputed facts are that the District was formed after a majority of the property owners in Cape St. Claire petitioned to have the special community benefit district created. In order to comply with A.A.Code § 2–102(e)(2) the Association amended its bylaws "so that, if [the District were legislatively created], then everybody in the district becomes automatically a member of the improvement association." (Statement of counsel for petitioners in opposition to motion for summary judgment.) Members may vote by mail ballot or in person at an annual meeting for the officers of the Association.

Based on those undisputed facts, and on the absence of any evidence of an interim attrition in the membership below the originally petitioning majority, the circuit court concluded that the Association *represents* 100% of the property owners in the District. The Court of Special Appeals pointed out that there is no evidence of any rival to the Association as administrator of the District, or, in the words of that court, there was "no pretender to that throne." We agree.

The logical interpretation of § 2–102(e)(3) is that the community association-administrator must be organized on representative democratic principles. The statute in essence requires that the organizational structure of an association must "provide[ ]" for all property owners in the district to be members. Further, a majority of the property owners must retain the power, if exercised, to determine who the officers will be and, at least in the case of contested elections for office, what the association's policies will be. An administering association, however, need not affirmatively show that the then current officers actually have been elected by a majority of the entire membership. That would be a most unlikely interpretation to apply to membership corporations. *See* Md. Code (1975, 1993 Repl.Vol.), Corporations and Associations Article, § 5–202(b)(5) (permitting special quorum provisions in charter or bylaws); § 5–202(b)(8) (permitting provision for voting by mail in charter or bylaws); and § 5–206 (providing that, after an insufficient number of members is present at a meeting, an additional meeting may be called at which "the members present in person or by proxy constitute a quorum"). The philosophy of a required absolute majority which petitioners espouse, if applied at the national level, would leave the United States of America without a President.

For all the foregoing reasons, the Circuit Court for Anne Arundel County was correct in granting judgment in favor of the defendants, and the Court of Special Appeals was correct

in affirming.[5]

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONERS.*

---

**5.** In view of this conclusion we have no occasion to consider the petitioners' request for counsel fees under 42 U.S.C. § 1983.